UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ONS S. ALKHADRA, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION |
| v. | ) | NO. |
| | ) | |
| HARVARD UNIVERSITY, | ) | |
| BRUCE DONOFF, D.M.D., M.D., | ) | |
| JOHN D. DASILVA, D.M.D., M.P.H., | ) | |
| STEPHEN T. SONIS, D.M.D., D.M.Sc., | ) | **COMPLAINT AND** |
| and T. HOWARD HOWELL, D.D.S. | ) | **JURY DEMAND** |
| | ) | |
| Defendants. | ) | |
| | ) | |

## PRELIMINARY STATEMENT

Dr. Ons S. Alkhadra attended the Harvard School of Dental Medicine from the Fall of 2003 until January of 2008, when the School forced her to withdraw without justification and in violation of her rights and the School's own policies and procedures. The School, and certain individual faculty members, fabricated plagiarism charges and academic deficiencies as pretextual justifications for dismissing Dr. Alkhadra. The School and these faculty members were predisposed against Dr. Alkhadra and were determined to expel her even though the allegations against her were unsupported and, in fact, contradicted by the weight of the evidence. In doing so, the School breached its contract with Dr. Alkhadra, discriminated against her, and committed numerous torts and wrongs which have resulted in serious professional, financial, academic, and emotional harm to Dr. Alkhadra.

## PARTIES

1.    Plaintiff Ons S. Alkhadra ("Dr. Alkhadra") is a citizen of the Kingdom of Saudi Arabia and the United States and resides in Washington, D.C. Dr. Alkhadra is a former student

in the Harvard School of Dental Medicine Doctoral program, and is also licensed to practice

dentistry in Saudi Arabia and the Gulf Region.

2.       Defendant Harvard University (the "University") owns and operates a series of

post-secondary educational institutions in Boston and Cambridge in the Commonwealth of

Massachusetts, including the Harvard School of Dental Medicine ("HSDM").

3.       Defendant Bruce Donoff, D.M.D., M.D. ("Dean Donoff") is an individual who,

upon information and belief, resides in Massachusetts.  Dr. Donoff was the Dean of HSDM at

all times relevant to this complaint.

4.       Defendant John D. DaSilva, D.M.D., M.P.H. is an individual who, upon

information and belief, resides in Massachusetts.  Dr. DaSilva was an HSDM faculty member

and HSDM's Director of Advanced Graduate Education at all times relevant to this complaint.

5.       Defendant Stephen T. Sonis, D.M.D., D.M.Sc. is an individual who, upon

information and belief, resides in Massachusetts.  Dr. Sonis was an HSDM faculty member at

all times relevant to this complaint.

6.       Defendant T. Howard Howell, D.D.S. is an individual who, upon information and

belief, resides in Massachusetts.  Dr. Howell was an HSDM faculty member at all times

relevant to this complaint.

## JURISDICTION AND VENUE

7.       This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331,

on the grounds that this case arises under 42 U.S.C. § 2000d, which is a law of the United

States.

8.       The Court also has subject matter jurisdiction over this action under 28 U.S.C. §

1332(a), on the grounds that the controversy exceeds $75,000, exclusive of costs and interest,

2

and the case is between citizens of different states, and/or a citizen of a state, namely the Commonwealth of Massachusetts, and a subject of a foreign state, namely the Kingdom of Saudi Arabia, who resides in the District of Columbia.

9.     Venue is proper in this district under 28 U.S.C. § 1391(b)(1) and (2).

## FACTUAL BACKGROUND

10.     Dr. Alkhadra was born in Jeddah, Saudi Arabia.  She attended primary and secondary school in Saudi Arabia where she graduated first in her class from the Al-Zahra High School at the age of sixteen.

11.     Dr. Alkhadra enrolled in a seven-year dental program at King Abdullah Aziz University in Saudi Arabia where she graduated sixth in her class with a Bachelor's degree in Dental Science.  By virtue of this degree, Dr. Alkhadra is licensed to practice dentistry in Saudi Arabia and the entire Gulf Region.

12.     Dr. Alkhadra then applied to HSDM and was accepted into a post-graduate program leading to a Master's degree in Medical Science with a Certificate in Oral Medicine. She enrolled at HSDM in the Fall of 2003.

13.     HSDM issues a Student Handbook to each student that governs all aspects of academic life at the school.  By virtue of her status as a student at HSDM, there was a contract between Dr. Alkhadra, on the one hand, and the Defendant University and HSDM, on the other hand.  Some of the terms of that contract are contained in the HSDM Student Handbook.

14.     Dr. Alkhadra excelled at HSDM, and her program director, Dr. Sook-Bin Woo, urged her to upgrade from the HSDM Master's program to the HSDM Doctoral program.  The Doctoral program, which leads to a Doctor of Medical Science Degree with a Certificate in Periodontics, required an additional two years of education.  Dr. Alkhadra was accepted into the

3

Doctoral program and started her work in the fall of 2005. Her anticipated graduation date was June 2008.

15.     As part of her required training, Dr. Alkhadra treated paying patients in the Harvard Dental Center during the 2005-2006 and 2006-2007 academic years. She spent approximately 15-20 hours per week at the clinic treating patients and supervising pre-doctoral candidates. Dr. Alkhadra was not compensated.

16.     Students participating in the Doctoral program were required to pass an Oral Qualifying Examination ("OQE"), submit a thesis proposal, and defend a thesis. Other than submitting the thesis proposal, which Dr. Alkhadra successfully passed, Dr. Alkhadra did not have to complete these requirements for a Master's degree.

17.     Dr. Alkhadra progressed towards her Doctoral degree by completing her course work and clinical training, and by passing her thesis proposal. She also scored in the top two percent (2%) nationally on the National In-Service Examination in periodontics. Her only outstanding requirements for the Doctoral degree were the completion of her OQE and the defense of her thesis.

**The Oral Qualifying Examination**

18.     Dr. Alkhadra's OQE was scheduled for November 17, 2006.

19.     The purpose of the OQE is to test a student's mastery of the accepted scientific knowledge taught during the first two years of the HSDM Doctoral program. The OQE is aimed at testing a student's knowledge of accepted scientific facts only. It is not a defense of a research thesis requiring the student to contribute his or her own original thought.

20.     The HSDM Student Handbook does not provide any specific guidelines on the extent to which a student must cite the sources of his or her knowledge in an answer on the OQE.

21.     Immediately prior to Dr. Alkhadra's OQE, Dr. Sonis, who was one of the faculty members who comprised Dr. Alkhadra's OQE Committee, asked Dr. Alkhadra inappropriate and unexpected questions about her departure from a laboratory in which she had previously been conducting research.  It was clear from the substance and timing of Dr. Sonis's questions that he had an unfavorable opinion of Dr. Alkhadra, and his questions were intended to, and did, unnerve and disrupt her performance on the OQE.

22.     In large part because of Dr. Sonis's unexpected and inappropriate questioning, Dr. Alkhadra experienced severe anxiety during the OQE, which adversely affected her performance.  Nonetheless, she provided correct answers to many of the questions that she was asked.

23.     After approximately one hour, the OQE Committee suspended the OQE and gave Dr. Alkhadra a grade of incomplete.

24.     Not one member of the OQE Committee informed Dr. Alkhadra that she had failed the OQE, or that she was in danger of failing it.  The grading sheet signed by all members of the OQE Committee confirmed that Dr. Alkhadra had received a grade of "incomplete," rather than a failing grade, which was also an option on the form.

25.     Following the exam, Dr. Alkhadra met with Dr. Howell and explained to him that her anxiety had adversely impacted her performance on the OQE.  Dr. Howell verbally confirmed to Dr. Alkhadra that she had not failed the OQE, and told her that the committee would reconvene at a later date to finish the examination.  Dr. Howell told Dr. Alkhadra that

this second session was to be limited in scope and duration, and was solely intended to complete the suspended OQE.

**The OQE Committee Reconvenes To Finish the Examination**

26.     On  February 26, 2007, the OQE Committee reconvened to test Dr. Alkhadra on the remaining portions of the OQE.

27.     Despite Dr. Howell's assurances, however, the second OQE session far exceeded the scope that he had outlined during his meeting with Dr. Alkhadra.  In addition, Dr. Sonis once again acted inappropriately towards Dr. Alkhadra during the second OQE session by, among other things, asking questions that went beyond the scope of the OQE and interfering with questions asked by other committee members.  Even as Dr. Alkhadra became visibly upset, Dr. Sonis persisted in his questions and inappropriate behavior.  Dr. Sonis's actions appeared to be deliberately designed to undermine Dr. Alkhadra's ability to answer the questions.

28.     Nevertheless, Dr. Alkhadra still provided correct answers to many of the questions she was asked during the second OQE session.

29.     After approximately one hour of questioning, the OQE Committee again suspended the OQE and gave Dr. Alkhadra a grade of "incomplete."

30.     Dr. Alkhadra was not informed that she had failed the OQE or that she was in danger of failing it.  The grading sheets once again confirmed that Dr. Alkhadra had not received a failing grade, but a grade of "incomplete."

31.     The OQE Committee then offered Dr. Alkhadra a choice.  She could either: (a) transfer back into the HSDM Master's program, for which the completion of the OQE was not required, or (b) continue in the Doctoral program by passing a written examination in lieu of the

OQE.  If Dr. Alkhadra transferred to the Master's program, she would have earned her Master's degree immediately as well as the Oral Medicine Certificate, and would have had only one year left to complete the Periodontology Certificate training.

32.     Dr. Alkhadra chose to continue in the Doctoral program and take the written examination.

33.     Dr. Alkhadra was never given a failing grade on either of the OQE sessions, and was not informed that she had allegedly failed until months after the fact when HSDM was trying to force her to withdraw.

34.     The HSDM Handbook states that any student who fails part or parts of an oral qualifying examination and does not complete a make-up within six months must retake the examination in its entirety with a new OQE Committee.  Dr. Alkhadra was never given the option to retake the OQE with a different OQE committee.

### The Written Examination

35.     The written examination was scheduled for May 2007.  Dr. Howell told Dr. Alkhadra that it would be a "closed book" exam, meaning that she would not be allowed to consult any outside materials during the examination.  Dr. Alkhadra was never given any other rules, guidelines, or policies concerning the written examination.

36.     On or about March 30, 2007, Dr. Howell's office provided Dr. Alkhadra with a typed list of twenty-nine questions from the OQE Committee members.  Dr. Alkhadra was told that the five questions that would comprise the written examination would be drawn directly from this list.

37.     Given the length of time Dr. Alkhadra had to prepare for the written examination, she prepared and committed to memory her answers to the majority of the twenty-nine potential

questions.  The utilization of this studying method – which was not prohibited by Dr. Howell, the HSDM Student Handbook, or anyone else – was necessary to help reduce her chances of experiencing another episode of severe anxiety during the examination.  Due to the heavy emphasis on memorization in the Saudi Arabian school system, which required extensive and precise memorization of Islamic texts including the Quran, Dr. Alkhadra had the ability to memorize lengthy passages from written texts and recreate them from memory with a very high level of accuracy and precision.

38.     One of the questions supplied by Dr. Sonis asked:

> "Neutrophils play a role in periodontal disease.  Compare and contrast those periodontal conditions which are caused by quantitative changes vs. those which are related to qualitative changes.  Give examples of conditions falling into both categories and explain how they would be diagnosed."

39.     This question required a recitation of accepted scientific facts and did not call for any original thought or analysis.

40.     In researching her answer to this question before the written exam, Dr. Alkhadra located a review article in a scientific journal called Periodontology 2000 that outlined and synthesized all of the accepted scientific knowledge on the topic of neutrophils and their role in periodontal disease.

41.     Because the article contained most of the information necessary to answer the question on neutrophils, Dr. Alkhadra studied the article closely and relied upon it when drafting her answer in preparation for the exam.

42.     On Friday, May 4, 2007, Dr. Howell instructed Dr. Alkhadra to pick up the five written exam questions and return the completed examination the following Monday.  Dr. Howell did not require that anyone be present to supervise or proctor the examination.

43.     On Sunday, May 6, Dr. Alkhadra completed the written examination, at all times abiding by the "closed book" conditions set by Dr. Howell.

44.     For those questions to which Dr. Alkhadra had prepared answers ahead of time, including Dr. Sonis's question about neutrophils, she recalled the answer purely from memory, and reproduced it during the examination period.

45.     On Monday, May 7, 2007, Dr. Alkhadra delivered a hard copy of her answers to Dr. Howell's office and also submitted them by email.

46.     Later that day, Dr. Alkhadra met with Dr. Howell to discuss the examination. Dr. Alkhadra described how she had spent her time during the "closed book" examination period and confirmed to Dr. Howell that she had not consulted any outside materials during the examination. Dr. Howell approved of the manner in which Dr. Alkhadra had completed the examination.

### HSDM Accuses Dr. Alkhadra of Plagiarism As A Pretext And Forces Her To Withdraw From HSDM

47.     After Dr. Alkhadra submitted her examination answers, but without her knowledge, the HSDM Committee on Graduation Education ("CAGE") began investigating the circumstances of her written examination based upon suspicions by Dr. Sonis and Dr. DaSilva that she had not complied with the exam's "closed book" requirement.

48.     Drs. Sonis and DaSilva, and later the CAGE, alleged that Dr. Alkhadra had not taken the exam "closed book." Upon information and belief, this was based, in large part, on one CAGE member's conclusion that parts of Dr. Alkhadra's answer to the neutrophil question tracked portions of the Periodontology 2000 article on which Dr. Alkhadra had relied in preparing her answer ahead of time.

49.     However, as reflected in their meeting minutes, the CAGE was unable to uncover any evidence that Dr. Alkhadra had violated the "closed book" mandate during the examination.

50.     On or about Thursday June 7, 2007, Dr. Howell and Ann Berg, HSDM's Head of Student Affairs, met with Dr. Alkhadra regarding these allegations.

51.     Dr. Alkhadra denied these allegations and was forthright in explaining that she had located the <u>Periodontology 2000</u> article while preparing for the exam, and that she had relied on it when preparing her answer to the neutrophil question ahead of time. Dr. Alkhadra further explained that she had memorized her answers and reproduced them from memory during the exam. Dr. Alkhadra offered to recite one of her answers from memory on the spot, but was denied that opportunity.

52.     On or about June 11, 2007, at a meeting of the CAGE, Dr. Howell described Dr. Alkhadra's explanation and stated that it was clear to him that she did not understand that memorizing an answer, part of which was taken from an outside source, allegedly constituted plagiarism. Dr. Howell also acknowledged that such memorization techniques were common and encouraged in Saudi Arabia, thereby implying that Dr. Alkhadra had made an honest mistake.

53.     Nonetheless, by a letter dated June 21, 2007, Dr. DaSilva informed Dr. Alkhadra that she would be required to withdraw from HSDM based on her "failure to academically progress in the program and violation of the School's standard of academic, professional and scientific conduct, which includes honesty and integrity with regard to examinations."

54.     This decision was not supported by the CAGE's investigation and was, in fact, contradicted by much of the evidence and discussion presented during the investigation.

55.     The CAGE never reviewed Dr. Alkhadra's academic record, which indicated that Dr. Alkhadra was meeting, and often exceeding, the program's academic requirements. Not one of Dr. Alkhadra's academic records indicated that she was failing to progress as a student.

56.     There was never any proof that Dr. Alkhadra violated the "closed book" mandate. To the contrary, Dr. Alkhadra was clear, both with Dr. Howell and later with the CAGE, that she had relied on the Periodontology 2000 article but that she had prepared her own answers ahead of time and reproduced them during the examination.

57.     Dr. Alkhadra was never told that she would be guilty of plagiarism if she failed, during a closed book written examination, to cite a review article that summarized purely factual material.  In fact, as reflected in the CAGE and Appeals Board minutes, there is not even unanimity among HSDM personnel as to whether such actions constitute plagiarism.  The CAGE knew, or should have known, that the HSDM rules did not clearly address this situation.

58.     During the CAGE process, Dr. Alkhadra also made several attempts to work with the HSDM Ombudsman's Office to assist her in resolving the allegations.  However, Dr. Alkhadra received little to no assistance, and the HSDM Ombudsman ultimately dropped her minimal efforts to help resolve these issues.

59.     On or about June 29, 2007, while the appeals process was still ongoing, Dr. DaSilva informed Dr. Alkhadra that she was no longer permitted to see patients in the Teaching Practice, or supervise predoctoral students, because she had "been withdrawn" from HSDM.

60.     This directive by Dr. DaSilva effectively terminated Dr. Alkhadra's enrollment at HSDM long before the completion of the appeals process and in contravention of the procedures contained in the HSDM Handbook.

61.    The CAGE, as one of several reviewing bodies under the HSDM grievance procedures, did not have the authority to unilaterally force Dr. Alkhadra to withdraw. Moreover, HSDM's own procedures afforded Dr. Alkhadra at least two levels of appeal from the CAGE's decision.

### Dr. Alkhadra Appeals the CAGE's Decision

62.    In accordance with HSDM's rules, Dr. Alkhadra promptly sought reconsideration of the CAGE's decision by a comprehensive letter dated July 5, 2007.

63.    On or about July 16, 2007, the CAGE summarily denied Dr. Alkhadra's request for reconsideration. The CAGE minutes show that the CAGE did not even engage in any discussion of the substantive issues raised in Dr. Alkhadra's letter, the letters of support submitted by faculty members attesting to Dr. Alkhadra's academic qualifications, or her academic record, which indicated that she had met or exceeded academic requirements throughout her time at HSDM. Furthermore, in a later meeting between Dr. Alkhadra and some CAGE members it was clear that some of them had not even read her appeal.

64.    On July 30, 2007, Dr. Alkhadra, through counsel, filed a timely appeal of the CAGE's decision.

65.    As part of this process, Dr. Alkhadra asked HSDM faculty members and fellow students to submit letters of support to aid her appeal. Although each person Dr. Alkhadra contacted was willing to support her, ultimately several declined to submit a letter for fear of reprisal by Dr. DaSilva, who had made it known that he would not look favorably upon anyone submitting letters in support of Dr. Alkhadra.

66.    On or about August 23, 2007, Dean Donoff appointed an *ad-hoc* Appeals Board to review Dr. Alkhadra's appeal.

67.     On November 14, 2007, the *ad-hoc* Appeals Board upheld the CAGE's decision based on: (a) Dr. Alkhadra's alleged "failure to progress academically;" and (b) her alleged "violation of the school's standards of academic, professional and scientific conduct." However, as reflected in the Board's meeting minutes, the Appeal Board's review raised significant questions that cast doubt on HSDM's ability to support such a decision.

68.     The Appeals Board never reviewed Dr. Alkhadra's academic record, which indicated that Dr. Alkhadra was , contrary to its findings, meeting and often times exceeding the program's academic requirements.

69.     The Appeals Board acknowledged that HSDM could not prove that Dr. Alkhadra had cheated on the written examination.

70.     The Appeals Board also acknowledged the fact that it was questionable whether Dr. Alkhadra's conduct even violated the school's rules regarding plagiarism.

71.     The Appeals Board admitted that the HSDM procedures for the OQE were not followed, stating:  "Another thing that should be questioned is how Dr. Howell gave her a third exam by throwing out the second one.  The process should be clear and followed if it says after the second exam is failed you get to choose another committee."

72.     The Appeals Board questioned why the remainder of Dr. Alkhadra's exam had not been graded (only the answer to Dr. Sonis's question on neutrophils had been graded), and how the school could force a student to withdraw for failure to progress academically when the test that formed the basis of that conclusion was never fully evaluated.  One Appeals Board member admitted: "Ultimately academic inefficiency will be used to prove [] decision to dismiss Ons.  But it gets a little shaky when you didn't answer [stet] the other five questions." Dr. DaSilva responded to this point stating: "Didn't want to spend more time on the exam."

73.     In fact, all of Dr. Alkhadra's written answers met or exceeded the requirements of a doctoral program. Neither the examiners, CAGE, nor the Appeals Board took the time to review the full exam.

74.     The Appeals Board also questioned why Dr. Alkhadra did not ask her research mentor, Dr. Schaffer, to testify before it. Upon information and belief, the Appeals Board members held this as an adverse inference against her, despite never interviewing Dr. Schaffer themselves (as they were entitled to do). In fact, the reason Dr. Alkhadra had not called Dr. Schaffer was because she had just started working with him and she had had only minimal interactions with him to that point.

75.     After receiving the letter upholding the CAGE's decision, Dr. Alkhadra appealed directly to Dean Donoff.

76.     On or about December 21, 2007, Dr. Alkhadra met with Dean Donoff. Dean Donoff summarily upheld the *ad-hoc* Appeals Board's decision. Upon information and belief, Dean Donoff did not even review the complete file before denying Dr. Alkhadra's final appeal in January 2008.

77.     As a result of her forced withdrawal from HSDM, Dr. Alkhadra has been unable to enroll in another dental program, and her dental education has been delayed for at least three years.

78.     Dr. Alkhadra has been forced to endure the severe, negative stigma associated with being required to withdraw from HSDM while she attempts to pursue her chosen professional career.

## There is Evidence of Discrimination By HSDM
## Against Saudi Nationals and Muslims

79.     There is a discriminatory and hostile attitude at HSDM toward Saudis and Muslims.

80.     Dr. Alkhadra was treated far more harshly than at least one other non-Saudi Arabian HSDM student who was determined to have committed plagiarism in connection with the development of a thesis proposal.  Upon information and belief, instead of being forced to withdraw from HSDM after being accused of plagiarism, this other student was merely given a warning and was permitted to continue as a student at HSDM without any further sanction.

81.     Upon information and belief, HSDM admitted to this student that part of the reason behind the benign punishment was that the school felt it was reasonable for a foreign student to not entirely grasp the complexities of the plagiarism rules.

82.     Upon information and belief, HSDM considers Saudi Arabian students generally to be inferior academically and used this prejudice against Dr. Alkhadra.  Meeting minutes reflect that at least two members of the *ad-hoc* Appeals Board blamed the Saudi Arabian government for pushing allegedly unqualified students into HSDM's rigorous programs.  In addition, another HSDM faculty member noted that Dr. Alkhadra was such a poor student that the faculty member only wanted "to give her enough knowledge to go back to Saudi Arabia."

83.     According to the CAGE minutes, the same member dissented from the vote to require Dr. Alkhadra to withdraw because she was unsure what plagiarism meant in this case and "was afraid the committee was punishing Ons for her religious views (memorizing the Koran)."

84.     Defendants failed to preserve the confidentiality required in the grievance process and broadcast false information regarding Dr. Alkhadra throughout HSDM.

## COUNT I
### (Breach of Contract – The University)

85.     Dr. Alkhadra repeats and incorporates herein by reference the allegations set forth in paragraphs 1-84 of this Complaint.

86.     Dr. Alkhadra had a valid contract with the University.

87.     Some of the terms of that contract are reflected in the HSDM Student Handbook, including but not limited to:

   a. Any student who fails part or parts of an oral qualifying examination and does not complete a make-up within six months must retake the examination in its entirety with a new OQE Committee;

   b. Students have the right to be informed about the criteria for academic evaluation, satisfactory performance, promotion, and graduation;

   c. Students have the right to be informed of the policies, rules, and regulations of the HSDM and to participate in the development and implementation of such policies when appropriate;

   d. Students have the right to appeal decisions related to their promotion, performance, professionalism, or their compliance with School policies;

   e. The Appeals Board is required to conduct a fair and unbiased review of a student's appeal;

   f. The decision of the Dean regarding an appeal from the Appeals Board will be final and binding only after the student has exhausted appeal and grievance rights or has elected not to do so; and

    g.  HSDM does not tolerate discrimination on the basis of race, color, gender, sexual orientation, religion, age, national origin, ethnic background, political belief, veteran status, disability status or any other improper basis.

88.    By violating the terms of HSDM's own Handbook, the University breached its contract with Dr. Alkhadra by actions including but not limited to:

    a.  Failing to offer Dr. Alkhadra the option to choose a new OQE committee after she allegedly failed the OQE;

    b.  Informing Dr. Alkhadra throughout her years at HSDM that she was meeting academic expectations if, in fact, she was not;

    c.  Failing to inform Dr. Alkhadra that it would be considered plagiarism to rely on portions of an article that recited purely scientific facts from memory during a closed book examination without citing the article;

    d.  Failing to conduct a complete and unbiased investigation into the CAGE's allegations against Dr. Alkhadra;

    e.  Disregarding the weight of the evidence, as acknowledged by the CAGE and the Appeals Board, to require Dr. Alkhadra to withdraw from HSDM;

    f.  Requiring Dr. Alkhadra to withdraw from HSDM before the Dean made a final decision, thus prematurely terminating Dr. Alkhadra's appeal rights; and

    g.  Discriminating against Dr. Alkhadra on the basis or her religion and/or national origin and disciplining her far more severely similarly situated non-Saudi Arabian and/or non-Muslim student.

89.    The procedures contractually guaranteed by the Handbook were not followed or conducted with basic fairness.

90.     By violating the terms of its own handbook and Dr. Alkhadra's reasonable expectations, the University breached its contract with Dr. Alkhadra.

91.     By arbitrarily and capriciously requiring Dr. Alkhadra to withdraw from HSDM, the University breached its contract with Dr. Alkhadra.

92.     As a direct and proximate result of the University's actions, Dr. Alkhadra has been injured and has suffered damages.

## COUNT II
### (Breach of Implied Covenant of Good Faith and Fair Dealings – The University)

93.     Dr. Alkhadra repeats and incorporates herein by reference the allegations set forth in paragraphs 1-92 of this Complaint.

94.     By breaching its contract with Dr. Alkhadra, the University breached the implied covenant of good faith and fair dealing contained in that contract.

95.     By engaging in the actions detailed above, including but not limited to improperly and illegally discriminating against Dr. Alkhadra and forcing her to withdraw from her program without justification and with improper motives in violation of provisions in the HSDM Handbook, the University breached the implied covenant of good faith and fair dealing contained in the contract.

96.     As a direct and proximate result of the University's actions, Dr. Alkhadra has been injured and has suffered damages.

## COUNT III
### (Intentional Interference with Contractual Relations – Drs. Bruce Donoff, John DaSilva, Stephen Sonis, and Howard Howell (collectively the "Individual Defendants"))

97.     Dr. Alkhadra repeats and incorporates herein by reference the allegations set forth in paragraphs 1-96 of this Complaint.

98.     Dr. Alkhadra had a contractual relationship with the University.

99.     The Individual Defendants knew about Dr. Alkhadra's contractual relationship with the University, and intentionally, knowingly, and willfully interfered with that contractual relationship.

100.    The Individual Defendants' actions to intentionally interfere with Dr. Alkhadra's contractual relationship with HSDM included but are not limited to: (1) violating HSDM's established policies and procedures; (2) providing Dr. Alkhadra with false and misleading information regarding her academic standing and the substance and procedure of her examinations; (3) discriminating against Dr. Alkhadra; (4) creating anxiety and stress by asking Dr. Alkhadra improper and irrelevant questions prior to and during her oral examinations; (5) recommending an unduly harsh and unjustified punishment for Dr. Alkhadra; (6) spreading false information regarding Dr. Alkhadra throughout the HSDM community; (7) preventing students and faculty members from speaking in support of Dr. Alkhadra during her appeal; and (8) requiring Dr. Alkhadra to withdraw from HSDM before her appeal was complete, in violation of HSDM procedure.

101.    As a result of the Individual Defendants' intentional and improper interference with Dr. Alkhadra's contractual relationships with the University, Dr. Alkhadra has been injured and has suffered damages.

## COUNT IV
### (Unfair and Deceptive Trade Practices – All Defendants)

102.    Dr. Alkhadra repeats and incorporates herein by reference the allegations set forth in paragraphs 1-101 of this Complaint.

103.    At all times relevant hereto, the Defendants were engaged in trade or business, including but not limited to operation of the Harvard Dental Center.

104.    The University's activities were outside of its core mission.

19

105.   The Defendants' conduct occurred primarily and substantially in Massachusetts.

106.   The Defendants knowingly and willingly engaged in conduct that was unfair, deceptive, and in violation of M.G.L. c. 93A, including but not limited to: (1) violating HSDM's established policies and procedures; (2) breaching HSDM's contract with Dr. Alkhadra; (3) intentionally interfering with HSDM's contract with Dr. Alkhadra; (4) committing fraud and deceit by providing Dr. Alkhadra with false and misleading information regarding her academic standing and the substance and procedure of her examinations; (5) discriminating against Dr. Alkhadra based on her religion and national origin; (6) arbitrarily and capriciously recommending an unduly harsh and unjustified punishment for Dr. Alkhadra; (7) spreading false information regarding Dr. Alkhadra throughout the HSDM community; and (8) preventing students and faculty members from speaking in support of Dr. Alkhadra during her appeal.

107.   All the while, the University continued to accept tuition payments for Dr. Alkhadra's education and required Dr. Alkhadra to treat patients in the Harvard Dental Center.

108.   Plaintiff sent demand letters to the Defendants on September 23 and November 4, 2009, over thirty days prior to filing this action.  The Defendants did not make any offer of settlement in response to these letters.

109.   As a direct and proximate result of the Defendants' unfair and deceptive acts and practices, Dr. Alkhadra has been injured and has suffered damages.

## COUNT V
### (Negligent Misrepresentation – All Defendants)

110.   Dr. Alkhadra repeats and incorporates herein by reference the allegations set forth in paragraphs 1-109 of this Complaint.

111.   The Defendants made several materially false representations to Dr. Alkhadra, including but not limited to: (1)  misinforming Dr. Alkhadra regarding the requirements for the OQE and written OQE; (2)  telling Dr. Alkhadra that her only options after the 2nd OQE were to transfer back to the Master's program or take the written test; (3) misinforming Dr. Alkhadra regarding the scope of the OQE; (4) telling Dr. Alkhadra that she was passing all of her classes and performing well, if she allegedly was not; (5) telling Dr. Alkhadra that she had received a grade of incomplete on the OQE if she had allegedly failed; (6) telling Dr. Alkhadra that she had not failed the OQE if she had, in fact, failed; and (7) telling Dr. Alkhadra that the only rule for the written examination was to take it "closed book."

112.   The Defendants knew, or reasonably should have known, that these representations were material and untrue.

113.   The Defendants made these misrepresentations for the purpose of misleading Dr. Alkhadra.

114.   Dr. Alkhadra had no way of knowing, and in fact did not know, of the falsity of these misrepresentations.

115.   Dr. Alkhadra justifiably relied on these misrepresentations by, among other things: (1) not citing the sources of her knowledge on either the OQE or the written test; (2) not seeking a separate OQE committee comprised of different members; (3) preparing as directed for the second OQE session; (4) preparing as directed for the written OQE; (5) completing the written OQE; and (6) continuing her studies over a course of years without making alterations or changes to improve her performance.

116.   As a direct and proximate result of the Defendants' misrepresentations, Dr. Alkhadra has been injured and has suffered damages.

## COUNT VI
### (Deceit/Fraud – All Defendants)

117.    Dr. Alkhadra repeats and incorporates herein by reference the allegations set forth in paragraphs 1-116 of this Complaint.

118.    The Defendants made several materially false representations and/or omissions to Dr. Alkhadra, including but not limited to: (1) misinforming Dr. Alkhadra regarding the requirements for the OQE and written OQE; (2) telling Dr. Alkhadra that her only options after the 2nd OQE were to transfer back to the Master's program or take the written test; (3) misinforming Dr. Alkhadra regarding the scope of the OQE; (4) telling Dr. Alkhadra that she was passing all of her classes and performing well, if she allegedly was not; (5) telling Dr. Alkhadra that she had received a grade of incomplete on the OQE if she had allegedly failed; (6) telling Dr. Alkhadra that she had not failed the OQE if she had, in fact, failed; (7) telling Dr. Alkhadra that the only rule for the written examination was to take it "closed book"; (8) failing to provide Dr. Alkhadra with the rules, policies and regulations that governed the written examination she was given; (9) failing to define plagiarism, in the Student Handbook or elsewhere, as prohibiting the use, without citation, of purely factual information contained in scientific literature; (10) failing to present Dr. Alkhadra with the option of seeking a new OQE committee comprised of different members; (11) failing to inform Dr. Alkhadra that she was prohibited from preparing answers ahead of time and committing them to memory; and (12) failing to inform Dr. Alkhadra that she was in danger of failing.

119.    The Defendants knew, or reasonably should have known, that these misrepresentations and/or omissions were material and false.

120.    The Defendants made these misrepresentations and/or omissions for the purpose of misleading Dr. Alkhadra.

121.    Dr. Alkhadra had no way of knowing, and in fact did not know, of these omissions or the falsity of these misrepresentations.

122.    Dr. Alkhadra justifiably relied on these misrepresentations and/or omissions.

123.    As a direct and proximate result of the Defendants' omissions and misrepresentations, Dr. Alkhadra has been injured and has suffered damages.

## COUNT VII
### (Title VI Discrimination – The University)

124.    Dr. Alkhadra repeats and incorporates herein by reference the allegations set forth in paragraphs 1-123 of this Complaint.

125.    The University, and its employees and agents, discriminated against Dr. Alkhadra because of her religion and/or national origin in violation of 42 U.S.C. § 2000d.

126.    Upon information and belief, the Defendants discriminated, or attempted to discriminate, against Dr. Alkhadra by engaging, or causing others to engage in, the acts set forth above in paragraphs 79-84, in violation of 42 U.S.C. § 2000d.

127.    By the actions of the Defendants, Dr. Alkhadra was treated differently than similarly situated non-Saudi Arabian and/or non-Muslim students.

128.    The University is an entity that receives financial assistance from the federal government.

129.    As a direct and proximate result of these actions, Dr. Alkhadra has been injured and has suffered damages.

## COUNT VIII
### (Discrimination – All Defendants)

130.    Dr. Alkhadra repeats and incorporates herein by reference the allegations set forth in paragraphs 1-129 of this Complaint.

131.    The University, by and through its employees and agents, including the Individual Defendants, discriminated against Dr. Alkhadra because of her religion and/or national origin in violation of 42 U.S.C. § 1981.

132.    Upon information and belief, the Defendants discriminated against Dr. Alkhadra by engaging, or causing others to engage in, the acts set forth above, in violation of 42 U.S.C. § 1981.

133.    By virtue of the actions of the Defendants, Dr. Alkhadra was treated differently than similarly situated non-Saudi Arabian and/or non-Muslim students.

134.    As a result of these discriminatory actions, Dr. Alkhadra was denied the ability to make and enforce her contract with the University, and was also denied the ability to enjoy the fruits of that contractual relationship.

135.    As a direct and proximate result of these actions, Dr. Alkhadra has been injured and has suffered damages.

## COUNT IX
**(Conspiracy – Drs. Bruce Donoff, John DaSilva, Stephen Sonis, and Howard Howell)**

136.    Dr. Alkhadra repeats and incorporates herein by reference the allegations set forth in paragraphs 1-135 of this Complaint.

137.    The Individual Defendants agreed to, and did participate in a conspiracy aimed at depriving Dr. Alkhadra, directly or indirectly, of equal protection of the laws, or of equal privileges and immunities under the laws in violation of 42 U.S.C. § 1985.

138.    Upon information and belief, the Defendants engaged in acts in furtherance of the conspiracy in violation of 42 U.S.C. § 1981, including but not limited to: (1) deviating from HSDM's established policies and procedures when evaluating and taking disciplinary actions against Dr. Alkhadra; (2) providing Dr. Alkhadra with false and misleading information

regarding her academic standing and the substance and procedure of her examinations; (3) discriminating against Dr. Alkhadra; (4) exacerbating Dr. Alkhadra's anxiety by asking her improper and irrelevant questions prior to and during her oral examinations; (5) recommending an unduly harsh punishment for Dr. Alkhadra; (6) punishing Dr. Alkhadra more severely than similarly situated non-Muslim students and/or non-Saudi Arabian students; and (7) preventing students and faculty members from speaking in support of Dr. Alkhadra during her appeal.

139.    As a result thereof, Dr. Alkhadra has been injured and suffered damages.

WHEREFORE, Plaintiff, Ons S. Alkhadra prays that this Court:

a.    Enter a judgment in her favor on all Counts of this Complaint;

b.    Award Dr. Alkhadra all damages she proves at trial to have suffered as a result of Defendants' conduct as described above;

c.    Award Dr. Alkhadra treble damages, pursuant to M.G.L. c. 93A;

d.    Order restitution to Dr. Alkhadra of all tuition she paid to the University;

e.    Award Dr. Alkhadra all costs, expenses and attorneys' fees she incurs in connection with this matter; and

f.    Award Dr. Alkhadra such further relief as justice requires.

**PLAINTIFF HEREBY DEMANDS A TRIAL BY JURY ON ALL CLAIMS TRIABLE.**

Respectfully submitted,

ONS S. ALKHADRA,
By her attorneys,


   /s/ Bruce S. Singal
Bruce A. Singal, BBO#464420
Lauren Dwyer, BBO#657727
Donoghue, Barrett & Singal, P.C.
One Beacon Street, Suite 1320
Boston, MA  02108
(617) 720-5090

Dated:   June 25, 2010